## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 29 2020, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark Housand, *Appellant-Defendant,* | December 29, 2020 |
| v. | Court of Appeals Case No. 20A-CR-375 |
| | Appeal from the St. Joseph Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Jeffrey L. Sanford, Judge |
| | Trial Court Cause No. 71D03-1812-F1-21 |

**Crone, Judge.**

# Case Summary

A jury convicted Mark Housand of one count of level 1 felony child molesting and one count of level 4 child molesting. On appeal, Housand argues that the trial court committed reversible error in admitting certain evidence. We disagree and therefore affirm his convictions.

# Facts and Procedural History

The relevant facts most favorable to the verdicts follow.[1] In 2010, Housand and his wife Deborah adopted four children; the youngest, their daughter C.H., was born in March 2009. In July 2017, Housand and Deborah separated. Deborah stayed in the marital residence, and Housand moved into his mother's house in Mishawaka. C.H. lived with Deborah and visited Housand every other weekend from Friday evening through Sunday evening.

On Friday, November 23, 2018, Deborah dropped off C.H. at Housand's residence. Housand's adult stepdaughter Amber and her teenage son were also in the home. Housand came into Amber's bedroom and "knelt down by [her] bed[.]" Tr. Vol. 2 at 23. Housand smelled of alcohol, and Amber could tell that "[h]e'd been drinking." *Id*. Housand asked Amber to come upstairs and watch a movie in his bedroom. Amber thought that this request "was odd" because there was a TV in the living room. *Id*. at 24. Amber told him no, but

---

[1] We remind Housand's counsel that an appellant's statement of facts "shall describe the facts relevant to the issues presented for review" and shall state the facts "in accordance with the standard of review appropriate to the judgment or order being appealed." Ind. Appellate Rule 46(A)(6).

Housand persisted. Amber felt "uncomfortable" and "didn't understand why [Housand] was being so persistent on stopping what [she] was doing to watch a movie." *Id*. at 34. Eventually, Amber's son came into the room and said, "[C]ome on, grandpa, […] she'll watch a movie with you later." *Id*. at 25. Housand started "mumbling and cussing under his breath and walk[ed] off and [took] C.H. upstairs" to his bedroom. *Id*.

[4] Housand and C.H. laid down on the bed and started watching a movie on his TV. Housand squeezed C.H.'s buttocks with his hand. He tried to take off her clothes, but she slapped his hand. He took off his pants, placed her hand on his penis, and had her move it up and down. He then had her place her mouth on his penis and move it up and down. C.H. told Housand to stop, which he did, and asked him why he was doing that to her. Housand said that he was stupid and told C.H. not to tell anyone because he would go to prison. They fell asleep in his bed.

[5] The next morning, both Amber and her son noticed that C.H. was acting out of character. C.H. "didn't even acknowledge" Amber when Amber came into the kitchen, *id*. at 26, and when Amber's son gave C.H. one of his customary "pat[s]," she "[t]old him to stop touching her." *Id*. at 53. On Sunday, November 25, when C.H. was back at Deborah's house, her older sister A.H. also noticed that C.H. was behaving differently; C.H., who was "usually really loud[,]" "really wasn't talking to anybody." Tr. Vol. 3 at 9. When the two girls were in the bathroom together, C.H. told A.H. what Housand did to her. A.H. told C.H. that they should tell Deborah about it, which they did. Deborah

called the police and took C.H. to the hospital, where she was examined by sexual assault nurse examiner Roberta Norris.

[6] Mishawaka Police Department Special Victims Unit Detective Zach DeGeyter contacted Deborah and asked her to bring C.H. to the CASIE child advocacy center in South Bend for a forensic interview. On November 26, C.H. was interviewed by forensic interviewer Sarah Wisthuff. During the interview, which was recorded, C.H. described what Housand did to her and drew circles on anatomical drawings of a male and a female indicating that her hand and mouth touched Housand's penis and that Housand's hand touched her buttocks. Detective DeGeyter observed the interview from an adjoining room. Afterward, he called Housand and "scheduled an interview for him to come into SVU voluntarily the next day." *Id*. at 22.

[7] At the beginning of the interview, which was recorded, Detective DeGeyter informed Housand that an allegation of a "sexual nature" had been made against him and advised him of his rights. State's Ex. 6. Housand signed a waiver-of-rights form. Detective DeGeyter asked Housand to describe what happened Friday evening. Housand claimed that C.H. came upstairs to his bedroom around 8:30 p.m. and said that she did not want to sleep by herself. He said that she could watch TV, which she did, and they fell asleep on his bed. The next morning, she said that she wanted to watch cartoons, and he went downstairs to make pizza rolls. Housand claimed that he did not drink alcohol when the children were around and that he drank Bacardi rum with Dr. Pepper when he was alone.

[8]     Detective DeGeyter began questioning Housand about C.H.'s allegation that something "sexual" occurred on Friday evening; Housand denied it but acknowledged that he had consumed one drink and 800 milligrams of ibuprofen. *Id.* The detective confronted Housand with C.H.'s allegation that he had put her hand and mouth on his penis. Housand initially said that that "never happened[,]" but after further questioning, he claimed that he did not "remember" anything like that happening, and then he acknowledged that C.H. "might have" put her hand and mouth on his penis. *Id.* Detective DeGeyter asked if C.H.'s hand was on his penis for more than three minutes, and Housand replied, "I don't even think it was that long." *Id.* The detective asked if C.H.'s mouth was around his penis for "maybe a couple minutes and that's it," and Housand replied, "I don't think it was that long." *Id.* The detective then asked, "Did she just try it and then she said 'I don't want to do this anymore' kind of thing?" *Id.* Housand replied, "I don't know, maybe." *Id.* The detective asked Housand if he wanted to write an "apology letter" to C.H., and then left the interview room while Housand did so. *Id.*[2] When the interview resumed, Housand claimed that he had also consumed some "muscle

---

[2] The letter reads,

> I am so sorry for what ever [sic] I did I will always love you with all my heart I hope you do not stop loving me ever I really don't remeber [sic] clearly but they keep telling me that I am guilty of the things that you say I did I never meant to hurt you honey never ever I am so sorry if I hurt you

State's Ex. 5.

relaxers" that evening. *Id*. Housand adamantly denied ejaculating or touching C.H.'s vagina.

[9] On December 4, 2018, the State charged Housand with one count of level 1 felony child molesting (alleging that he performed or submitted to sexual intercourse or other sexual conduct with C.H.) and one count of level 4 felony child molesting (alleging that he performed or submitted to fondling or touching with C.H. with the intent to arouse or satisfy his sexual desires). In April 2019, Housand and Deborah's divorce was finalized. A jury trial was held in August 2019 and ended in a mistrial.

[10] A second jury trial was held on December 2 and 3, 2019. The prosecutor called Wisthuff as a witness, questioned her about the issue of "coaching" child victims of sexual abuse, and asked if there were "any red flags of coaching" when she interviewed C.H. Tr. Vol. 2 at 77. Wisthuff replied "that there were a few things that were concerning, but then we questioned those and were satisfied." *Id*. The prosecutor then asked, "Based on your training and experience, do you find that children often want to make up stories or lie to you in a forensic interview?" *Id*. Wisthuff replied, "No." *Id*. The prosecutor asked, "And why not?" *Id*. Housand's counsel objected, stating, "[T]his is getting into the territory of vouching." *Id*. at 78. The trial court overruled the objection. In response to the prosecutor's question, Wisthuff testified, "Well, normally children lie to stay out of trouble or to stay out of stressful situations." *Id*. at 79. Nothing more was said on the subject.

[11] The prosecutor also called C.H. as a witness. She testified that Housand had her put her hand and mouth on his penis and go "[u]p and down." *Id*. at 93. The prosecutor showed C.H. the anatomical drawings on which she drew circles during her interview with Wisthuff. C.H. stated that she drew circles on the female's hand and mouth and the male's penis because her hand and mouth had to touch "his spot[,]" i.e., Housand's penis. *Id*. at 98-99. C.H. stated that she did not remember why she drew circles on the female's "[b]utt" and the male's "[h]and." *Id*. at 99-100. The prosecutor offered the drawings into evidence without objection and then initiated a sidebar, during which she indicated that she wanted to refresh C.H.'s memory by replaying the recording of her interview with Wisthuff for the jury. The trial court pointed out that the prosecutor had "already established the elements" of the molestation charges, i.e., the "oral sex" and the "fondling" of Housand's penis, and asked, "Why is it necessary to go beyond that?" *Id*. at 101. The prosecutor replied, "It would just go to her credibility and go to just the circumstances of the situation." *Id*. Over Housand's counsel's objection, the court allowed the prosecutor to publish the recording to the jury under the recorded recollection exception to the hearsay rule under Indiana Evidence Rule 803(5).

[12] Nurse Norris also testified for the prosecution and was asked, "Going back to specifically what [C.H.] told you had happened, what did she state?" Tr. Vol. 3 at 36. Housand's counsel objected, "Number one, it's hearsay, and number two, it is cumulative at this point in time. The child has already testified. We've already seen her recorded statement. This is becoming a drumbeat

recitation of what the child is telling person after person." *Id*. The trial court overruled the objection, and Norris ultimately testified,

> [C.H.] told me that she was on her way upstairs, and [Housand] said she could sleep with him. She stated that he does drink Bacardi. She did not know he was drunk. Once they were in the bed, he squeezed her butt, and he asked her if she would like to suck his private or - - I don't recall that detail, but he chose for her. He chose to suck [sic] his private in her mouth. After that was done, she stated she did fall asleep and woke up around midnight a couple hours later and the same thing happened again.
>
> She also told me that he stated if she were older, he could do other things in the bed with her.

*Id*. at 41.

[13] The prosecutor also called Detective DeGeyter as a witness. During his testimony, the prosecutor offered the recording of the detective's interview with Housand and Housand's "apology letter" to C.H. into evidence without objection.

[14] Housand testified in his own defense. He stated that C.H. told him that she did not want to sleep alone, and he told her that she could come upstairs and watch TV. They both fell asleep watching a movie. When they awoke the next morning, she said that she was hungry and wanted to finish watching the movie, so he "went and fixed her pizza rolls." *Id*. at 59. He denied noticing "anything off about C.H.'s behavior[,]" claiming that "she was giggling and laughing and eating pizza rolls and watching Kung Fu Panda." *Id*. at 62. He

also claimed that he consumed only one Bacardi and Dr. Pepper "[a]round suppertime" on Friday evening and took ibuprofen and "a muscle relaxant." *Id*. at 65, 64. He stated that during his interview with Detective DeGeyter, he "felt really intimidated and under pressure. And [the detective] kept telling me this and telling me this and telling me he had all this evidence. So I was just kind of going along with what he said." *Id*. at 66. Housand's counsel asked if C.H. ever put her hand or her mouth on his penis, and he replied, "Absolutely not." *Id*. at 66, 68.

[15] The jury found Housand guilty as charged. The trial court sentenced him to consecutive terms of twenty years for the level 1 felony and two years for the level 4 felony, for a total of twenty-two years executed. Housand now appeals.

# Discussion and Decision

## Section 1 – The trial court did not commit reversible error in admitting Wisthuff's statement.

[16] Housand contends that the trial court committed reversible error in admitting certain evidence. "Our standard of review for the admissibility of evidence is well established." *Whiteside v. State*, 853 N.E.2d 1021, 1025 (Ind. Ct. App. 2006). "The admission or exclusion of evidence lies within the sound discretion of the trial court and is afforded great deference on appeal." *Id*. "We will reverse the trial court's ruling on the admissibility of evidence only for an abuse of discretion." *Id*. "An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances

before it." *Id.* "Errors in the admission or exclusion of evidence are considered harmless unless they affect the substantial rights of a party." *Id.* "To determine whether an error in the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence on the jury." *Id.*

[17] Initially, Housand takes issue with the trial court's admission of Wisthuff's statements regarding coaching and why children do not often lie during forensic interviews, characterizing it as improper indirect vouching testimony. *See* Ind. Evidence Rule 704(b) (providing in pertinent part that witnesses may not testify to "whether a witness has testified truthfully"). Housand did not object to Wisthuff's testimony regarding coaching and therefore has waived any claim of error on this point. *Watson v. State*, 134 N.E.3d 1038, 1045 (Ind. Ct. App. 2019), *trans. denied* (2020). Moreover, he did not object to the prosecutor's question (or move to strike Wisthuff's answer) regarding whether children often lie during forensic interviews, so any claim of error on this point is waived as well. *Id.* Consequently, the only claim of error that Housand has preserved relates to Wisthuff's statement that "normally children lie to stay out of trouble or to stay out of stressful situations." Tr. Vol. 2 at 79. Assuming, without deciding, that this statement amounts to improper indirect vouching, we cannot conclude that this isolated statement in the course of a two-day trial affected Housand's substantial rights, especially in light of his admissions to Detective DeGeyter and his ample opportunities to question C.H.'s credibility. Housand has not met his burden to establish that the trial court committed reversible error in admitting the statement.

## Section 2 – The trial court did not commit reversible error in publishing the recording of C.H.'s interview to the jury.

[18] Next, Housand asserts that the trial court abused its discretion in publishing the recording of C.H.'s forensic interview with Wisthuff to the jury under the recorded recollection exception to the hearsay rule. Hearsay is a statement that is not made by the declarant while testifying at trial and that is offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). It is undisputed that C.H.'s statements to Wisthuff are hearsay, which is inadmissible unless the evidence rules or other law provides otherwise. Ind. Evidence Rule 802. Certain statements are not excluded by the rule against hearsay regardless of the declarant's availability as a witness, such as a recorded recollection, which is "[a] record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge." Ind. Evidence Rule 803(5). "If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party." *Id*.

[19] This Court has used a three-tiered approach in determining the admissibility of recorded recollections:

> (1) the unaided testimony of a witness is preferred; (2) if the unaided testimony is not available, the law prefers refreshed recollection; and (3) if the witness's recollection cannot be revived, "the recorded recollection exception to hearsay Rule 803(5) may be available to admit the document which contains the witness's prior knowledge of the facts in question."

*Marcum v. State*, 772 N.E.2d 998, 1002 (Ind. Ct. App. 2002) (quoting *Smith v. State*, 719 N.E.2d 1289, 1290-91 (Ind. Ct. App. 1999)).

[20] Here, as Housand points out, "C.H. had already provided testimony addressing all of the elements of the charges. Accordingly, the jury already had sufficient information upon which to deliberate." Appellant's Br. at 13. Moreover, as Housand observes, the prosecutor "could have shown C.H. her interview, or even the relevant portion of her interview in an attempt to refresh her recollection." *Id*. Under these circumstances, we conclude that the trial court abused its discretion in publishing the interview to the jury as a recorded recollection. But because C.H.'s statements to Wisthuff regarding the molestation are merely cumulative of C.H.'s trial testimony, we conclude that the publication did not affect Housand's substantial rights. *See Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) ("The improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact."), *trans. denied*. Accordingly, we find no reversible error.

## Section 3 – The trial court did not commit reversible error in admitting Norris's statement.

[21] Finally, Housand argues that the trial court abused its discretion in admitting Norris's testimony regarding C.H.'s description of the molestation. On appeal, Housand has abandoned his hearsay argument and instead focuses on the cumulative nature of the testimony. "Admission of cumulative evidence is within the discretion of the trial court." *Traxler v. State*, 538 N.E.2d 268, 270

(Ind. Ct. App. 1989). Housand asserts that this situation "is similar to the situation contemplated in *Stone v. State*, 536 N.E.2d 534 (Ind. Ct. App. 1989), where the court noted that the [molesting] victim's [']credibility became increasingly unimpeachable as each adult added his or her personal eloquence, maturity and professionalism to the [victim's] out[-]of[-]court statements[']"[3] regarding the alleged molestations, and the court ultimately reversed the defendant's convictions based on its finding that the statements were unfairly prejudicial. Appellant's Br. at 15 (citing *Stone*, 536 N.E.2d at 540-41).

[22] We disagree with Housand's assertion. In *Stone*, the trial court admitted the testimony of four adult witnesses and the victim's sister regarding what they were told about the molestations. Here, Norris was the only person to testify about C.H.'s out-of-court statements describing the molestation, and that testimony was brief and unembellished; the only other statements describing the molestation were from either C.H. herself or Housand, who admitted to Detective DeGeyter that C.H.'s hand and mouth touched his penis for at least a

---

[3] Housand's brief does not indicate that much of this excerpt is a verbatim quotation from *Stone*.

short time.  Housand has failed to establish an abuse of discretion, let alone reversible error, and therefore we affirm his convictions.[4]

[23]    Affirmed.

Robb, J., concurs.

Brown, J., dissents with separate opinion.

---

[4] In *Kress v. State*, 133 N.E.3d 742 (Ind. Ct. App. 2019), *trans. denied*, which the dissent quotes in expressing its concerns about "drumbeat repetition," the court was concerned with the admission of testimony from three witnesses other than the child molesting victim, who also testified at trial.  The *Kress* court found no reversible error, noting that the victim "was the first witness to testify and she was subjected to cross-examination.  She gave specific, descriptive testimony about the touching.  The subsequent witnesses gave only general testimony about the existence of allegations.  No subsequent witness delved into [the victim's] version of events."  *Id*. at 747-48.  Here, C.H. testified in detail and was subjected to cross-examination, and Norris was the only third party to repeat, in just a few sentences, C.H.'s account of the molestation.  Moreover, unlike in either *Kress* or *Stone*, the victim's story in this case was corroborated by the defendant's admissions to the police.  In sum, we find the dissent's concerns about "drumbeat repetition" both overstated and insufficient to justify reversal.

| Mark Housand, *Appellant*, | Court of Appeals Case No. 20A-CT-375 |
|---|---|
| v. | |
| State of Indiana, *Appellee*. | |

**Brown, Judge, dissenting.**

[24]     I respectfully dissent.  Housand argues that the admission of the recorded CASIE interview, which the majority agrees was an abuse of discretion as a recorded recollection, constitutes reversible error.  He further argues that the professional testimony offered, first by forensic interviewer Wisthuff and then by Nurse Norris, was unduly prejudicial and improperly bolstered C.H.'s credibility, and that, given the lack of medical findings and DNA evidence, the entire case against him hinged on whether the jury accepted C.H.'s testimony. *See* Appellant's Brief at 14.  Based upon my review of the evidence, I agree.

[25]     With respect to the recorded CASIE interview, the record reveals that the prosecutor made sidebar comments to the trial court indicating that C.H. did not remember "two parts" and that "the foundation ha[s] been laid for recorded

recollection to play the CASIE interview." Transcript Volume II at 101. While the prosecutor stated the video recording of the CASIE Center interview was "not being admitted as an exhibit for the jury to take back with them," to which the court responded, "I understand," the disc of the recording was labeled as State's Exhibit 3, and the prosecutor played the entire recording in the presence of the jury. *Id.* at 104-105. The record demonstrates that the prosecutor did not adequately attempt to refresh C.H.'s recollection before seeking to play the recording. When a witness "displays only partial memory," the memorandum or record "can be read with respect to matters about which the witness's memory is insufficient." MILLER, 13 INDIANA PRACTICE, IND. EVIDENCE § 803.105 (citing *Small v. State*, 736 N.E.2d 742, 745 (Ind. 2000)). *See also Smith*, 719 N.E.2d at 1290-1291. *Cf. Small*, 736 N.E.2d at 745 ("Here, the State established that during her trial testimony, Ms. Compton could not recall the exact answers she previously gave during her deposition. In an attempt to refresh her recollection, Ms. Compton was given a copy of her deposition. *Even after careful review, she could not recall making the specific statements documented in her deposition*. As such, the trial court properly permitted the State to read *relevant portions* of her deposition into evidence pursuant to Indiana Evidence Rule 803(5)." (emphases added)); *Horton v. State*, 936 N.E.2d 1277, 1281, 1283 (Ind. Ct. App. 2010) (likening the case before it to *Small* and finding no error in the trial court allowing the State to show the victim's videotaped interview with DCS to the jury under the recorded recollection exception after, "*[a]t a break in . . . trial testimony*," the victim watched the interview to refresh her memory and

she still did not remember numerous details when she resumed her testimony), *vacated on other grounds*.

[26] Importantly, this Court has recently summarized its concerns with the drumbeat repetition of evidence:

> In a criminal case, the core issue at trial is, of course, what the defendant did (or did not do), not why someone else did (or did not do) something. For this reason, the Indiana Supreme Court has urged courts to take caution when a prosecutor offers an otherwise[ ]inadmissible assertion for the purpose of providing context for the jury. Indeed, when an out-of-court assertion is offered for some ancillary purpose, we must pay careful attention to that proffered purpose. This is because Indiana Evidence Rule 403 contemplates exclusion where the probative value of the evidence is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Evid. R. 403 . . . . In short, Indiana law does not permit minimally probative end runs around the rule against hearsay. Thus, "[i]f the fact sought to be proved under the [proffered] non-hearsay purpose is not relevant, or it is relevant but its danger of unfair prejudice substantially outweighs its probative value, the hearsay objection should be sustained." *Craig v. State*, 630 N.E.2d 207, 211 (Ind. 1994).
>
> One danger of prejudice arises in the "drumbeat repetition" of an out-of-court assertion. *See, e.g.*, *Modesitt v. State*, 578 N.E.2d 649, 651-52 (Ind. 1991). Indeed, in light of a proffered non-hearsay purpose, exclusion might not be warranted where there is a mere isolated reference to an assertion. *See* Evid. R. 403. However, as additional testimony about the assertion "beats the drum," there is increasing danger the jury will use the testimony for an improper purpose. For example, the jury might use the testimony as proof of the matter asserted. . . . Or, the jury could

treat the repetitive testimony as a form of vouching for the credibility of the declarant. . . . As to the latter risk, this type of problematic vouching is not the blatant type prohibited by Evidence Rule 704(b) – where a witness directly opines about "the truth or falsity of allegations" or "whether a witness has testified truthfully." Evid. R. 704(b). Rather, the risk is insidious. That is, the repeated references might eventually inundate the jury, leading them toward an inference that witnesses are vouching for the credibility of the declarant. *See, e.g.*, *Stone v. State*, 536 N.E.2d 534, 540 (Ind. Ct. App. 1989) (identifying impermissible vouching where the victim's credibility "became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the] out-of-court statements"), *trans. denied*.

*Kress v. State*, 133 N.E.3d 742, 746-747 (Ind. Ct. App. 2019) (some citations and quotations omitted), *trans. denied*.

[27]    The jury heard first Wisthuff's testimony about C.H.'s CASIE Center forensic interview and the interview process, and that C.H. was able to provide sensory and peripheral details, including who was present and their actions the night of the incident. Wisthuff answered in the negative when asked, "[b]ased on your training and experience, do you find that children often want to make up stories or lie to you in a forensic interview," and defense counsel objected in response to the next question of "why not" on the bases of speculation and vouching, which the court overruled. Transcript Volume II at 77. Wisthuff answered, stating: "Well, normally children lie to stay out of trouble or stay out of stressful situations." *Id.* at 79. This testimony served to bolster C.H.'s credibility.

[28] Next, C.H. testified at length. After she indicated that she could not remember why she circled the girl's behind and the boy's hand, and without adequately first attempting to refresh her recollection, the prosecutor sought to play – and did play – the entirety of the forty-minute video recording of the CASIE interview for the jury. Accordingly, the jury viewed a forensic interview for forty minutes containing numerous inculpatory, cumulative statements outside the scope for which the recording was played, far in excess of those portions of which C.H. stated she could not remember details.

[29] The State additionally sought to elicit statements about what had happened through Nurse Norris, who indicated that she had explained to C.H. that she "just want[ed] her to be honest." Transcript Volume III at 34. Following the overruled objection, Nurse Norris provided details of the incident, including alleged propositions by Housand and his alcohol consumption habits. *See id.* at 40-41.

[30] Based on my review of the record, and considering the State's case *in toto* which turned on C.H.'s credibility, I cannot say that the improper admission of evidence was harmless. I conclude that the State impermissibly beat the drum and that repeated allegations risked use by the jury as proof of the matters asserted or as a form of vouching for C.H. The prosecutor went too far, and I would reverse and remand for a new trial.